739 S.E.2d 882

Thomas W. GLADDEN and Vera H. Gladden, Appellants,

v.

Olivia M. BOYKIN, Elizabeth Beard, Deborah Appleton, Bob Capes Realty, Inc., Russell & Jeffcoat Realtors, Inc., and Palmetto Home Inspection Services, LLC, Defendants,

Of Whom Palmetto Home Inspections Services, LLC, is the Respondent.

Appellate Case No. 2010–160789.

No. 27236.

Supreme Court of South Carolina.

Heard Feb. 8, 2012.

Decided March 27, 2013.

B. Michael Brackett, of Moses & Brackett, PC, of Columbia, for Appellants.

Joseph Scott McCue, of Collins & Lacy, PC, of Columbia, and Logan McCombs Wells, of Collins & Lacy, PC, of Greenville, for Respondent.

Justice PLEICONES.

Appellants Thomas and Vera Gladden appeal the trial court's order granting summary judgment to Respondent Palmetto Home Inspection Services, alleging the limit of liability provision in a home inspection contract was unenforceable as violative of public policy and as unconscionable under the facts of this case. We affirm.

## FACTS

In the course of purchasing a home, Vera H. Gladden (Mrs. Gladden) entered into a contract with Palmetto Home Inspec-. tion Services, LLC (Palmetto), for a home inspection. The contract contained a limit of liability clause, which limited Palmetto's liability to the home inspection fee paid by the client.[1] After Mrs. Gladden contacted Palmetto about certain conditions in the home that were not included in the home inspection report, Palmetto returned the inspection fee.

Subsequently, the Gladdens brought this action against the seller, real estate agents, and real estate companies involved in the transaction as well as against Palmetto. As to Palmetto, the Gladdens alleged an action for breach of contract for failing to conduct the inspection in a thorough and workmanlike manner and to report defective conditions in the home.

The Gladdens thereafter moved for summary judgment on the legal issue of the enforceability of the limit of liability clause. Palmetto filed a cross motion for summary judgment on the basis that the limit of liability clause was enforceable and that it was entitled to summary judgment because it had already refunded the inspection fee paid by the Gladdens.

The circuit court denied the Gladdens' motion and granted Palmetto's motion and entered summary judgment in favor of Palmetto, finding the limit of liability clause enforceable. This appeal followed.

## ISSUES

I. Did the circuit court err when it held that the limit of liability provision does not contravene South Carolina public policy?

---

1. In full, the clause read as follows:

   **LIMIT OF LIABILITY:** [ ]It is understood and agreed that should [Palmetto] and/or its agents or employees be found liable for any loss or damages resulting from a failure to perform any of it's [sic] obligations, including but not limited to negligence, [ ]breach of contract or otherwise, the the [sic] liability of [Palmetto] and/or it's [sic] agents or employees shall be limited to a sum equal to the amount of the fee paid by the client for this inspection and report.

II. Did the circuit court err when it held that the limit of liability provision is not unconscionable under these circumstances?

## DISCUSSION

**A. Public Policy**

■ On appeal, the Gladdens contend the circuit court erred when it held that the limit of liability provision does not contravene South Carolina public policy. We disagree.

■ Our courts must determine public policy by reference to legislative enactments wherever possible. *See Citizens' Bank v. Heyward*, 135 S.C. 190, 204, 133 S.E. 709, 713 (1925) ("The primary source of the declaration of the public policy of the state is the General Assembly; the courts assume this prerogative only in the absence of legislative declaration."); *Zerjal v. Daech & Bauer Const., Inc.*, 405 Ill.App.3d 907, 912, 345 Ill.Dec. 887, 939 N.E.2d 1067, 1072–73 (2010) ("Since the legislature had the opportunity to prohibit or limit exculpatory clauses in home inspection contracts but did not, we decline the opportunity as well.").

The General Assembly has spoken on the issue of home inspections and liability for undisclosed defects in the sale of residential property. Under the statutory scheme crafted by the General Assembly, purchasers are protected from unqualified home inspectors by licensure requirements. *See* S.C.Code Ann. § 40–59–500 et seq. (2011). However, the General Assembly did not require home inspectors to carry errors and omissions liability insurance.[2]

---

2. This fact alone substantially distinguishes South Carolina's public policy from that of New Jersey and this case from *Lucier v. Williams*, 366 N.J.Super. 485, 841 A.2d 907 (2004), on which the dissent heavily relies. The *Lucier* court pointed to the requirement under New Jersey statutory law that home inspectors maintain errors and omissions insurance and called this fact "[i]mportant to [its] analysis[.]" *Lucier*, 841 A.2d at 914–15. This distinction is highly significant, since enforcement of a liability limit in the home inspection contract would conflict with the clear intent of the New Jersey legislature that purchasers have recourse to insurance coverage in the case of a home inspector's negligence.

Although the General Assembly declined to require such coverage, it did not leave residential home buyers without remedy. The Residential Property Condition Disclosure Act ensures that buyers are informed of defects of which the seller has knowledge. *See* S.C.Code Ann. § 27–50–10 et seq. (2007 & Supp.2011). The Act imposes liability on a seller if she knowingly withholds such information. § 27–50–65. Thus, the General Assembly has already provided specific protection for the consumer risks associated with undisclosed defects, and we must defer to its judgment.

Even without this legislative policy, we would be reluctant to expand our judicially crafted public policy affording heightened protection to home purchasers. It is one thing to impose greater demands on the builder of a new home, who is in a position to know of the home's defects, and another to impose a similar standard on an inspector who makes only a brief survey of the home with the buyer's full knowledge of the limited service the inspector is offering. *See Sapp v. Ford Motor Co.*, 386 S.C. 143, 148, 687 S.E.2d 47, 49 (2009) ("[T]he transaction between a *builder* and a *buyer* for the sale of a home largely involves inherently unequal bargaining power.... [W]e created this narrow exception to the economic loss rule to apply solely in the residential home context.") (emphasis added). The General Assembly has imposed liability on the party with greatest access to information about the home's defects, where it most logically resides.

### B. Unconscionability

█ The Gladdens also contend that the circuit court erred when it found that the limit of liability clause was not unconscionable in this case. We disagree.

█ "In South Carolina, unconscionability is defined as the absence of meaningful choice on the part of one party due to one-sided contract provisions, together with terms that are so oppressive that no reasonable person would make them and no fair and honest person would accept them." *Simpson v. MSA of Myrtle Beach, Inc.*, 373 S.C. 14, 24–25, 644 S.E.2d 663, 668 (2007).

Limitation of liability and exculpation clauses are routinely entered into. Moreover, they are commercially reasonable in

at least some cases, since they permit the provider to offer the service at a lower price, in turn making the service available to people who otherwise would be unable to afford it. *See Head v. U.S. Inspect DFW, Inc.*, 159 S.W.3d 731, 748–49 (Tex.App. 2005) (noting that courts uphold limitations of liability in burglar and fire alarm system contracts and finding limitation of liability clause in home inspection contract commercially legitimate for the same reasons). We cannot say that a limitation of liability clause in a home inspection contract is so oppressive that no reasonable person would make it and no fair and honest person would accept it.

■ Thus, we need not consider whether the Gladdens lacked meaningful choice due to one-sided contract provisions. Nevertheless, we note our disagreement with the dissent's analysis.[3] Courts should not refuse to enforce a contract on grounds of unconscionability, even when the substance of the terms appear grossly unreasonable, unless the circumstances surrounding its formation present such an extreme inequality of bargaining power, together with factors such as lack of basic reading ability and the drafter's evident intent to obscure the term, that the party against whom enforcement is sought cannot be said to have consented to the contract. *See Williams v. Walker–Thomas Furniture Co.*, 350 F.2d 445, 449 (D.C.Cir.1965).

In this case, a self-employed home inspector operating out of his home had no significantly greater bargaining power or cognizably more sophistication than a trained though not practicing real estate agent, and there is no allegation that

---

3. The dissent again relies on *Lucier v. Williams*, a New Jersey decision that represents a dramatic departure from the narrow traditional use of unconscionability doctrine and markedly different from that of South Carolina law. *See Lucier*, 841 A.2d at 911 ("There is no hard and fast definition of unconscionability.... [It] is an amorphous concept obviously designed to establish a broad business ethic. The standard of conduct that the term implies is a lack of good faith, honesty in fact and observance of fair dealing." (internal quotation marks and citations omitted)); *cf. Simpson, supra; Williams, infra.* As for *Pitts v. Watkins*, another case on which the dissent relies, we agree with the *Pitts* dissent that *Pitts* dramatically departs from contract and unconscionability law, effectively rewriting a contract the court found "unfair" but that fell far short of oppression and completely omitting analysis whether the plaintiffs had a meaningful choice in entering into the contract. *See* 905 So.2d 553, 559–64 (2005) (Dickinson, J., dissenting).

Mrs. Gladden lacks the education to understand the terms of a contract or protect her own interests. On the contrary, the record demonstrates that Mrs. Gladden directly engaged in sophisticated negotiations throughout the process of buying the home, even urging the seller to forego the use of a real estate agent. Moreover, we have no record on which to find that home inspection contracts without exculpatory clauses are unavailable in the market. Not only did Roberts testify that he had altered the contract for a customer on another occasion, but Mrs. Gladden had sought out this particular inspector's services, declining to employ a different home inspector who had been described to her as "harder but best." *See Jordan v. Diamond Equip. & Supply Co.*, 362 Ark. 142, 207 S.W.3d 525 (Ark.2005) (finding an exculpatory clause enforceable in part because the plaintiff had sought out the services of the defendant). Thus, the evidence in this case fails to support an inference that Mrs. Gladden lacked meaningful choice.

The dissent also places significance on the fact that the limitation of liability clause was not highlighted in comparison to the contract's other terms. However, the proper test is whether an important clause was particularly inconspicuous, as if the drafter intended to obscure the term. *See Simpson*, 373 S.C. at 27–28, 644 S.E.2d at 670; *Williams*, 350 F.2d at 449. In this case, the contract consisted of one page, the heading of the limitation clause was in all capital letters and in bold, and the clause and its heading were in the same print as the contract's other terms. Thus, the record does not support a conclusion that the Gladdens lacked a meaningful choice whether to accept the terms of the contract.

## CONCLUSION

Contractual limitation of a home inspector's liability does not violate South Carolina public policy as expressed by the General Assembly and, as a matter of law, is not so oppressive that no reasonable person would make it and no fair and honest person would accept it. The circuit court's order granting summary judgment to Palmetto is

**AFFIRMED.**

TOAL, C.J., and KITTREDGE, J., concur. BEATTY, J., dissenting in a separate opinion, in which HEARN, J., concurs.

Justice BEATTY, dissenting.

I respectfully dissent and would reverse the grant of summary judgment given to Palmetto Home Inspection Services and remand the matter for further proceedings on the Gladdens' claims. For the reasons outlined below, I agree with the Gladdens that the limitation of liability provision in the home inspection contract was both unconscionable and violative of public policy.

## A. Unconscionability

Courts generally must enforce contracts that are freely entered into according to their terms. *Ellis v. Taylor*, 316 S.C. 245, 449 S.E.2d 487 (1994). However, "[i]f the court finds that a contract clause was unconscionable at the time it was made, the court may refuse to enforce the contract clause or limit the application of the unconscionable clause to avoid any unconscionable result." *Lackey v. Green Tree Fin. Corp.*, 330 S.C. 388, 397, 498 S.E.2d 898, 903 (Ct.App.1998).

The circuit court found as an initial matter that the home inspection contract was an adhesion contract.[4] This finding has not been disputed by the parties. "[U]nder general principles of state contract law, an adhesion contract is a standard form contract offered on a 'take-it-or-leave-it' basis with terms that are not negotiable." *Simpson v. MSA of Myrtle Beach, Inc.*, 373 S.C. 14, 26–27, 644 S.E.2d 663, 669 (2007); *see also Lackey*, 330 S.C. at 394, 498 S.E.2d at 901 (observing adhesion contracts are agreements in which one party has virtually no voice in the formulation of the contract terms and language (citation omitted)). "Adhesion contracts,

---

4. It is noted in *Corbin on Contracts* that the modern approach to examining contracts of adhesion and exculpatory clauses is to treat them differently from other contracts. 7 Joseph M. Perillo, *Corbin on Contracts* § 29. 10, at 415–16 (rev. ed.2002). The trend is justified based on three considerations: "(1) there was not true assent to a particular term; (2) even if there was assent, the term is to be excised from the contract because it contravenes public policy; or (3) the term is unconscionable and should be stricken." *Id.* at 416 (footnote omitted).

however, are not per se unconscionable." *Simpson,* 373 S.C. at 27, 644 S.E.2d at 669. "Therefore, finding an adhesion contract is merely the beginning point of the analysis." *Id.*

"In South Carolina, unconscionability is defined as the absence of meaningful choice on the part of one party due to one-sided contract provisions, together with terms that are so oppressive that no reasonable person would make them and no fair and honest person would accept them." *Id.* at 24–25, 644 S.E.2d at 668; *see also Fanning v. Fritz's Pontiac–Cadillac–Buick, Inc.,* 322 S.C. 399, 472 S.E.2d 242 (1996) (same). In short, a challenged contractual provision is examined to determine whether it is unconscionable due to both (1) an absence of meaningful choice and (2) oppressive, one-sided terms. *Simpson,* 373 S.C. at 25, 644 S.E.2d at 669.

"Absence of meaningful choice on the part of one party generally speaks to the fundamental fairness of the bargaining process in the contract at issue." *Id.* In analyzing the absence of meaningful choice, "[c]ourts should take into account the nature of the injuries suffered by the plaintiff; whether the plaintiff is a substantial business concern; the relative disparity in the parties' bargaining power; the parties' relative sophistication; whether there is an element of surprise in the inclusion of the challenged clause; and the conspicuousness of the clause." *Id.* In *Simpson,* this Court was careful to "emphasize the importance of a case-by-case analysis in order to address the unique circumstances inherent in the various types of consumer transactions." *Id.* at 36, 644 S.E.2d at 674.

The Gladdens assert that, while the circuit court found this was an adhesion contract and there was a disparity in the bargaining power of the parties, the court nevertheless discounted this disparity based on the fact that Mrs. Gladden had once worked briefly as a real estate agent. The Gladdens contend the implication is that a real estate agent can never be a regular "consumer" of the services of a professional home inspector. Mrs. Gladden testified that she had once worked in the real estate business, but it was only for a few months and she never had her own listings before deciding the real estate business was not for her. We agree that her limited work in this area is not relevant under the circumstances.

The parties clearly did not have equal bargaining power. The contract was not even presented to Mrs. Gladden until *after* Palmetto's owner, Scot Roberts, had already performed his physical inspection of the premises, thus leaving Mrs. Gladden very little time to examine the document, and there is no indication that Roberts ever advised her of the presence of a limitation of liability clause, either prior to the inspection or at the time the contract was presented after the inspection was over. Although the circuit court found Mrs. Gladden could have selected another inspector, a consumer is left with no *meaningful* choice if the limitation clause is prevalent throughout the industry,[5] especially where the consumer has a decidedly inferior bargaining position compared to the home inspector, who controls the contract terms by means of an adhesion contract that is oppressive and one-sided.

The limitation of liability provision did not stand out in the contract any more than the other provisions. All of the paragraphs begin with a heading in all capital letters, and the limitation provision was contained in one of five paragraphs that had headings in a bold font. Just looking at the document, this provision is no more noticeable than any other provision.

As to the circuit court's observation that a home inspection is not required by law, the Gladdens correctly note that home inspectors are licensed by the state and must meet certain standards. The purpose of these standards is to protect the public from unqualified inspectors. Moreover, an inspection is an essential part of most real estate purchases, and the need for a qualified inspector and the reliability of the inspector's professional judgment are crucial in these transactions. Roberts himself conceded that a home inspection is valuable to a client *because of the inspector's purported training, experience, and expertise.*[6]

---

5. Roberts testified that the contract he was using was based on one that was presented in a class regarding home inspections that he took in another state. He stated that, in the thousands of inspections he had performed, he could recall altering his contract only once—for an individual who was an engineer.

6. Roberts gave Mrs. Gladden a business card, which stated he had "30+" years of experience and that he was licensed, bonded, and

The Gladdens cite *Lucier v. Williams,* 366 N.J.Super. 485, 841 A.2d 907 (2004), in which the New Jersey court held that a contractual limitation of liability provision in a home inspection contract limiting liability to the lesser of $500 or half of the inspector's fee was both (1) unconscionable and (2) against public policy.

As to the finding of unconscionability, the court in *Lucier* noted "[t]here is no hard and fast definition of unconscionability" and that it is "an amorphous concept." *Id.* at 911 (citation omitted). In analyzing whether to enforce a contract term, the court stated it would look "not only to its adhesive nature, but also to 'the subject matter of the contract, the parties' relative bargaining positions, the degree of economic compulsion motivating the "adhering" party, and the public interests affected by the contract.'" *Id.* (citation omitted). The court stated particular attention was to be given to any inequality in the bargaining power and status of the parties, as well as the substance of the contract. *Id.* The court noted "contractual exemption from liability for negligence is rarely allowed to stand where the contracting parties are not on roughly equal bargaining terms." *Id.* (citation omitted).

In addition, the focus of the inquiry should be on whether the limitation is a reasonable allocation of risk between the parties or whether it runs afoul of the public policy disfavoring clauses that effectively immunize parties from liability for their own negligent acts. *Id.* at 911–12. "To be enforceable, the amount of the cap on a party's liability *must be sufficient to provide a realistic incentive to act diligently.*" *Id.* at 912 (emphasis added). The court stated:

Applying these principles to the home inspection contract before us, we find the limitation of liability provision unconscionable. We do not hesitate to hold it unenforceable for the following reasons: (1) the contract, prepared by the home inspector, is one of adhesion; (2) the parties, one a consumer and the other a professional expert, have grossly unequal bargaining status; and (3) the substance of the provision eviscerates the contract and its fundamental purpose because the potential damage level is so nominal that it

insured, yet Roberts testified that he had been a licensed home inspector for five and a half years.

has the practical effect of avoiding almost all responsibility for the professional's negligence.

*Id.* The court stated "the purchase of a home is usually the largest investment a person will make"; it may be made only once in a lifetime or infrequently. *Id.* "Home inspectors, on the other hand, conduct a volume operation," and "a major selling point of [their] service" is their knowledge about and experience in the industry, and the inspectors are uniquely aware of the cost of repairing major defects. *Id.* "The foisting of a contract of this type in this setting on an inexperienced consumer clearly demonstrates a lack of fair dealing by the professional." *Id.*

The court remarked that, "[i]n most cases, major defects will either not exist or, with due diligence and competence, they will be discovered and reported." *Id.* In evaluating the comparative repercussions to the parties, the court stated the impact of the professional's negligence upon the home buyer can be "monumental" when "considering issues such as habitability, health and safety, and financing obligations," and to allow little or no recovery for this professional negligence would "render the underlying purpose of the contract worthless" and provide "no meaningful incentive to act diligently." *Id.* at 913. Moreover, such an "excessively restricted damage allowance is grossly disproportionate to the potential loss to the home buyer if a substantial defect is negligently overlooked." *Id.* The court concluded it would not enforce the limitation in such circumstances because it was "tantamount to an exculpation clause, and warrants application of the same policy considerations." [7] *Id.*

In *Pitts v. Watkins*, 905 So.2d 553 (Miss.2005), the Supreme Court of Mississippi cited *Lucier* and held a limitation of

---

7. An exculpatory clause is defined as "[a] contractual provision relieving a party from liability resulting from a negligent or wrongful act." *Black's Law Dictionary* 648 (9th ed.2009). On its face, the provision on appeal here does not technically eliminate all liability, but it does limit any such liability to a return of the inspection fee. Because the fee is small in relation to the potential damages caused by the inspector's negligence, it is arguable that the provision functions to effectively eliminate all real liability. This is particularly true in light of a companion provision that requires arbitration because the arbitration fees are likely greater than any possible recovery. I find such terms to be oppressive and one-sided.

liability clause in a home inspection contract was unconscionable. The court in *Pitts* defined unconscionability "as 'an absence of meaningful choice on the part of one of the parties, together with contract terms which are unreasonably favorable to the other party' " *Id.* at 558 (citation omitted). This is the same as the definition applied under South Carolina law. The court noted that "[c]lauses that limit liability are given strict scrutiny by this Court and are not to be enforced unless the limitation is *fairly and honestly negotiated and understood by both parties.*" *Id.* at 556 (alteration in original) (citation omitted) (emphasis added).

In *Pitts,* as in the current appeal, the inspector provided the contract to the buyers "[i]mmediately following the completion of his inspection, but before providing the Pittses with his report[.]" *Id.* at 554. Thus, there was virtually no time for reflection on the terms by the home buyers. The court found unconscionability existed under all the circumstances. *Id.* at 556. The court stated after consumers have considered the aesthetics, the amenities, and the price of a particular house, quite often the only issue left is the integrity of the structure, and the decision whether to spend thousands of dollars to proceed with the purchase "is largely based upon a satisfactory inspection report." *Id.* The court found if a purchaser "can establish duty, breach, causation, and damages, then they should be entitled to full legal redress." *Id.* "To do otherwise would allow home inspectors to walk through the house in five minutes, fabricate a report, and escape liability, without any consideration of the consequences of their conduct." *Id.*

The court stated not allowing the recovery of reasonably foreseeable compensatory damages does not provide a *meaningful* choice to homeowners and is unreasonably favorable to the home inspector. *Id.* at 557. If the home inspector's only consequence is to refund the fee, there is also no meaningful incentive to act diligently and the inspector will be immunized from the consequences of his own negligence. *Id.*

In addition, the court noted that when the limitation of liability clause is paired with an arbitration clause in the home inspection contract, a plaintiff is effectively denied *any* recovery because the mandatory arbitration process would require fees in excess of any possible recovery, and this was further

evidence of unconscionability. *Id.* at 557–58. The court also noted a limitations period contained in the contract was evidence of unconscionability because it was shorter than the statutory limitations period. The court stated although this specific term (the time limit) was not argued by the Pittses, they had raised the issue of the unconscionability of the entire contract, which may be found when any terms are oppressive, and in reviewing the contract in its entirety, the court was entitled to consider the relation of all terms therein. *Id.* at 558.

Similarly, in the current appeal by the Gladdens, the contract contained a mandatory arbitration provision in addition to the limitation of liability provision. The interplay of these provisions would effectively leave a plaintiff with *no* recovery where the cost to arbitrate exceeds the potential recovery (return of the inspection fee).[8] Further, the contract required the buyer to notify Palmetto of any discrepancies within a very short period (ten days).

In my opinion, a limitation of liability clause that routinely appears in contracts between commercial entities for the sale of goods, and thus is seen repeatedly by the parties, is distinguishable from a provision appearing in a contract for professional services concerning a purchase by a private individual that may be made only once in a lifetime. In such cases, particularly when the contract is not shown until *after* the inspection has taken place, no effort is made to point out the exclusion, there is a great disparity in the bargaining power of the professional service provider and the consumer, and there is a virtual exclusion of all liability for professional negligence, I believe there is an absence of *meaningful* choice and the terms are oppressive and one-sided, rendering the limitation clause unconscionable.

## B. Public Policy

In addition to being unconscionable, I believe the limitation provision is violative of public policy.

---

8. *Cf. Myers v. Terminix Int'l Co.,* 91 Ohio Misc.2d 41, 697 N.E.2d 277 (1998) (holding an arbitration clause imposing an undisclosed nonrefundable filing fee on the consumer that was more than she had paid to have the defendant exterminate termites in her home was so one-sided as to oppress and unfairly surprise the consumer and was unconscionable and unenforceable).

"The general rule is that courts will not enforce a contract which is violative of public policy, statutory law, or provisions of the Constitution." *Simpson*, 373 S.C. at 29–30, 644 S.E.2d at 671; *see also Pride v. S. Bell Tel. & Tel. Co.*, 244 S.C. 615, 619, 138 S.E.2d 155, 156–57 (1964) ("[A] contractual provision seeking to relieve a party to a contract from liability for his own negligence may or may not be enforceable, depending upon whether it is violative of public policy."). "Since such provisions tend to induce a want of care, they are not favored by the law and will be strictly construed against the party relying thereon." *Pride*, 244 S.C. at 619, 138 S.E.2d at 157; *see also McCune v. Myrtle Beach Indoor Shooting Range, Inc.*, 364 S.C. 242, 247–51, 612 S.E.2d 462, 464–67 (Ct.App. 2005) (same).

"[O]ur decisions recognize the general principle that considerations of public policy prohibit a party from protecting himself by contract against liability for negligence in the performance of a duty of public service, or where a public duty is owed, or public interest is involved, or *where public interest requires the performance of a private duty*, or *when the parties are not on roughly equal bargaining terms*." *Pride*, 244 S.C. at 619–20, 138 S.E.2d at 157 (emphasis added). Expressions of public policy may be found in constitutional or statutory authority or in judicial decisions. *White v. J.M. Brown Amusement Co.*, 360 S.C. 366, 371, 601 S.E.2d 342, 345 (2004).

In evaluating the Gladdens' public policy argument, the circuit court observed that South Carolina law has allowed provisions limiting or exempting liability, citing *South Carolina Electric & Gas Co. v. Combustion Engineering, Inc.*, 283 S.C. 182, 322 S.E.2d 453 (Ct.App.1984) (enforcing the language of an exculpatory clause in a contract for the sale of a boiler). However, in *SCE & G*, the parties were commercially-sophisticated corporations and possessed relatively equal bargaining strength, and they had negotiated the terms over a period of several months. *Cf., e.g., Kennedy v. Columbia Lumber & Mfg. Co.*, 299 S.C. 335, 343–44, 384 S.E.2d 730, 735–36 (1989) (stating the Court has "taken judicial cognizance of the fact that a modern buyer of new residential housing is normally in an unequal bargaining position as against the seller").

The circuit court also opined that exculpatory clauses between private parties do not violate public policy, citing *Pride v. Southern Bell Telephone & Telegraph Co.*, 244 S.C. 615, 138 S.E.2d 155 (1964) and *McCune v. Myrtle Beach Indoor Shooting Range, Inc.*, 364 S.C. 242, 612 S.E.2d 462 (Ct.App.2005). *Pride*, however, involved a matter that did not affect a public interest (a telephone company's negligence in a contract for the publication of advertisements in a phone directory). Further, the Court specifically included among those matters that may implicate public policy considerations, those situations *"where public interest requires the performance of a private duty, or when the parties are not on roughly equal bargaining terms." Pride*, 244 S.C. at 620, 138 S.E.2d at 157 (emphasis added). Thus, the fact that there are private parties involved is not singularly determinative of whether a question of public policy may arise. *McCune* involved a release of liability at a paintball range, where we found participation was voluntary and comparable to other cases involving inherently risky recreational activities for which such limitations had been upheld. The cases cited by the circuit court do not concern professional service contracts, where different policy considerations exist because public policy is averse to allowing professional negligence to be insulated from liability by a contractual provision.

Lastly, the circuit court stated South Carolina law expressly allows a licensed home inspection company, such as Palmetto, to contractually limit the scope of its home inspection; consequently, a limitation on liability cannot violate public policy, citing S.C.Code Ann. § 40–59–500(4) (2011). This statute defines a "home inspection" and states in relevant part that "[t]he parties to a home inspection may limit or expand the scope of the inspection by agreement."

There is no question that an inspector may limit the physical scope of an inspection, i.e., what portions of the premises are to be inspected, but we find this is distinguishable from limiting the *amount of the inspector's liability* for professional negligence. Moreover, the Code further provides, "A home inspector shall disclose the scope and limitations, if any, of each inspection *before* performing a home inspection." *Id.* § 40–59–560(C) (emphasis added). In the current appeal, it is undisputed that Roberts did not present a contract to Mrs. Gladden until *after* he had already completed his entire inspec-

tion, so there can be no reliance on that provision here. In addition, Roberts does not argue that the Gladdens' claims concern matters that are outside the scope of what Roberts agreed to inspect.

In *Lucier v. Williams,* 366 N.J.Super. 485, 841 A.2d 907 (2004), the court found that the liability provision, in addition to being unconscionable, was "contrary to [the] state's public policy of effectuating the purpose of a home inspection contract to render reliable evaluation of a home's fitness for purchase and holding professionals to certain industry standards." *Id.* at 912. The court stated a home inspector provides a professional service because a home inspection "involves 'specialized knowledge, labor or skill and the labor or skill is *predominantly mental or intellectual,* rather than physical or manual.'" *Id.* at 914 (citation omitted). The home inspector is supposed to report all conditions that might cause the consumer costly repairs or maintenance, and the purpose of the inspection is to give the consumer a rational basis upon which to decline to enter into a contract to buy or to be relieved from a contractual commitment, or to offer a sound basis upon which to negotiate a lower price. *Id.* (citation omitted). The court stated limitation provisions in such circumstances are disfavored:

> With professional services, exculpation clauses are particularly disfavored. The very nature of a professional service is one in which the person receiving the service relies upon the expertise, training, knowledge and stature of the professional. Exculpation provisions are antithetical to such a relationship. It would be indeed a hollow arrangement if a physician could charge $100 for an office visit and then, if, due to negligence, a diagnosis is missed, resulting in a catastrophic illness or even death, the patient's only recourse would be a refund of $50 of the original $100 fee. Certainly, such a provision in a doctor-patient relationship would not be enforceable. Here, the home inspector held himself out as an expert and a professional. The disparity between the consequences of negligence to the home inspector and to the home buyer, like that between a physician and a patient, is very substantial.

*Id.* (internal citations omitted).

Lastly, as an alternative basis to the general public policy reasons addressed above, the court in *Lucier* looked to *express*

statements of public policy and noted that its legislature now required home inspectors to be licensed and to meet certain qualifications as to experience and to pass an examination. *Id.* at 915. In addition, inspectors must also now maintain errors and omissions insurance. *Id.* The court concluded the limitation of professional negligence violated public policy, as contained in both judicial and legislative sources. *Id.* at 916.

Palmetto attempts to distinguish *Lucier* primarily on the basis that the South Carolina General Assembly, while requiring professional licenses for home inspectors, so far has not *required* home inspectors to carry professional liability insurance, and the buyer in *Lucier* did not use an attorney for the purchase. I find this argument unpersuasive. In *Lucier* the court discussed the licensing and insurance requirements as just *one* aspect of *express* public policy (as exhibited in relevant legislation). Prior to that discussion, the court engaged in an independent analysis of general public policy, the fact that contracts shielding professional negligence are generally disfavored in the law, and the need to protect the public from acts of professional negligence when making a home purchase. That analysis is certainly applicable here. *Cf.* Restatement (Second) of Contracts § 179 (1981) (stating the bases of public policies against the enforcement of terms may be derived by a court from (a) legislation relevant to such a policy or (b) the need to protect some aspect of the public welfare).

Moreover, South Carolina's extensive licensing, regulation, "certificates of authorization," and bonding requirements are evidence of express public policy and our General Assembly's desire to protect the public from unqualified home inspectors. These requirements negate any inference that home inspectors may insulate themselves from all liability for their professional negligence. I also disagree with the majority's assertion that the General Assembly's enactment of the Residential Property Condition Disclosure Act, which imposes liability on a seller who knowingly withholds information regarding defects, has any bearing on the question of an inspector's liability for his or her own negligence in failing to detect a defect. It is not hard to imagine a case where a property has very serious defects affecting health and safety, about which a seller, as a layperson, has no knowledge, but that could, *and should,* be detected by an inspector using his or her profes-

sional expertise. If it were otherwise, there would be no need to have an inspection performed by a trained and licensed professional.

Under South Carolina law, the state may impose statutory or regulatory requirements for the purpose of protecting the public interest. S.C.Code Ann. § 40–1–10(B) (2011). In such cases, the General Assembly may consider implementing a system of certification and may also establish licensing procedures. *Id.* § 40–1–10(C). In evaluating the appropriate level of regulation to impose, if any, the General Assembly examines, among other things, whether the service is required by a substantial portion of the population; whether the profession or occupation requires such skill that the public generally is not qualified to select a competent practitioner without some assurance that the practitioner has met minimum qualifications; whether the professional or occupational associations do not adequately protect the public from incompetent, unscrupulous, or irresponsible members of the profession or occupation; and whether current laws that pertain to public health, safety, and welfare are generally inadequate to protect the public. *Id.* § 40–1–10(D).

The General Assembly has chosen to extensively regulate both the residential home business and home inspectors to protect consumers by requiring licensing, certificates of authorization, and surety bonds from practitioners in these fields. In 2000 the General Assembly enacted section 40–59–410, which requires a "residential business certificate of authorization" for firms engaging in the practice of residential home building, residential specialty contracting, and home inspecting. *Id.* § 40–59–410(A). Any qualifying firm must have "obtained an executed surety bond approved by the commission in the sum of fifteen thousand dollars initially and as subsequently provided by regulation[.]" *Id.* § 40–59–410(B)(2). Home inspectors are also strictly regulated under South Carolina law. *See* 10 S.C.Code Ann. Regs. 106–4 (2012) (enumerating extensive qualifications for home inspectors, including experience, education, and licensing); South Carolina Department of Labor, Licensing and Regulation, at *www.llr. state.sc.us* (providing requirements and forms). This is indicative of the fact that the subject involves a public interest.

As stated in section 40–1–10(B) of the South Carolina Code, the state imposes statutory or regulatory requirements for the purpose of protecting the *public interest* where the unregulated practice of the profession or occupation can harm or endanger the health, safety, or welfare of the public. S.C.Code Ann. § 40–1–10(B) (2011). It clearly has imposed these protective measures as to the residential home industry in general and as to home inspectors in particular. The state need not require insurance for professional negligence in order to conclusively establish the subject as one affecting the public interest. Indeed, there are other essential professions that similarly have no mandatory insurance requirement, yet professionals routinely acquire insurance for professional negligence for their own protection. Although not statutorily required, we note Roberts did, in fact, maintain an insurance policy of $300,000, and he held himself out to the public as being "bonded, licensed, and insured." The only purpose of such a representation would be to incur the reliance and trust of the public as to his professionalism and reliability.

Based on the foregoing, I believe the limitation of liability clause at issue here violates public policy. As a general matter, public policy is averse to allowing those committing professional negligence to insulate themselves from all liability by a contractual provision, especially where the clause is contained in an adhesion contract and the contract concerns a matter that affects the public interest. A home inspection is, for all practical purposes, a service that is a necessity in the purchase of real estate, and the consumer is given no opportunity here to pay an additional fee to protect himself against the inspector's possible negligence. *See, e.g., Tunkl v. Regents of Univ. of Cal.*, 60 Cal.2d 92, 32 Cal.Rptr. 33, 383 P.2d 441, 444–46 (1963) (stating an exculpatory clause that affects the public interest cannot stand).

The limitation of liability provision also contravenes this state's express public policy as indicated in measures passed by the General Assembly that impose requirements as to experience, education, and licensing for home inspectors, as well as requirements for obtaining and maintaining bonds and "residential business certificates of authorization" in order to ensure the competency of home inspectors and protect the public interest.

160

For all of the above reasons, I conclude the circuit court erred in granting the motion for summary judgment and would remand the matter for further proceedings on the Gladdens' claims.

HEARN J., concurs.